No. 94-622

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

VERNON L. INGBRETSON,

      Claimant and Respondent,

  v.

LOUISIANA-PACIFIC CORPORATION,

      Respondent, Insurer,
      Employer and Appellant.

APPEAL FROM:    The Workers' Compensation Court,
               The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      Jerry Schuster, Kelso & Irwin, Coeur d'Alene, Idaho

      For Respondent:

      Jon L. Heberling, Attorney at Law, Kalispell, Montana

Submitted on Briefs:  June 29, 1995

Decided:  August 10, 1995

Filed:  AUG 10 1995

FILED

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Louisiana-Pacific Corporation appeals a judgment of the Workers' Compensation Court granting Vernon Ingbretson temporary total disability benefits for an occupational disease sustained within the course of his employment with Louisiana-Pacific. The court also awarded Ingbretson costs and attorney fees and a 20 percent penalty. We affirm.

We restate the issues as follows:

1. Did the Workers' Compensation Court abuse its discretion by deciding issues not raised in the pretrial order?

2. Did the court exceed its jurisdiction by deciding that Ingbretson was wrongfully discharged from his employment and did it then err in failing to apply the provisions of Montana's Wrongful Discharge from Employment Act?

3. Did the court err in finding that Ingbretson was temporarily totally disabled within the meaning of §§ 39-71-116(28) and -701, MCA?

4. Did the court err in awarding costs and attorney fees to Ingbretson pursuant to § 39-71-611 and § 39-72-402(1), MCA?

5. Did the court err in assessing a 20 percent penalty against Louisiana-Pacific pursuant to § 39-71-2907, MCA?

Vernon Ingbretson was employed as a laborer at Louisiana-Pacific's lumber mill in Libby, Montana. In 1992, he began noticing problems with his elbows. In June of 1993, he gave notice of an occupational disease to Louisiana-Pacific, which initially denied his claim.

2

Ingbretson continued working for Louisiana-Pacific except during periodic layoffs when there was not enough work at the mill. In August of 1993, he returned from a layoff to his regular job, or "bid job," as a forklift operator.

On August 4, 1993, the Employment Relations Division of the Montana Department of Labor & Industry entered an order determining that Ingbretson had an occupational disease--bilateral lateral epicondylitis. In an effort to keep him on the job, Louisiana-Pacific reassigned Ingbretson to a job as a stacker operator.

On August 13, 1993, Dr. Brus examined Ingbretson. Dr. Brus approved Ingbretson to work as a stacker operator, based on a description of the job as "to stand and keep in visual contact with 3 automatic stacking machines and on occasion pushing a button."

The actual work as a stacker operator was more physically demanding than suggested by the above job description. While on the stacker, Ingbretson had the task of picking short, rotten, or broken 2x4's off the machine. He often fell behind, and had to repeatedly lift the lumber. He was told to ask for help when he needed it, but often there was no one in view for him to ask.

From August 16 to September 28, 1993, Ingbretson alternated between the stacker position and a guard shack position. The guard shack position consisted of giving directions to vehicles entering the mill. At that time, Louisiana-Pacific did not have a full-time day shift guard shack worker. When Ingbretson was working the stacker, a secretary in the office performed the duties of the guard shack worker in addition to her secretarial duties.

3

Ingbretson worked the guard shack position when the pain in his elbows made it impossible to perform the stacker job, usually three days per week. His "bid job" remained forklift operator.

At Louisiana-Pacific's request, Dr. Hvidston examined Ingbretson on September 2, 1993. Dr. Hvidston disapproved the job of fork lift operator for Ingbretson. He approved a job of stacker operator, with the following conditions: "However Vernon relates help for the heavier lumber is not available and this causes pain. If he has repetitive lifting I would not approve." Dr. Hvidston approved a job of security officer without limitation.

On September 27, 1993, Ingbretson worked the stacker. He told his supervisor that his elbows were sore and asked to be taken off the stacker, but he was not reassigned during that shift. After work, Ingbretson took four Tylenol. He could not sleep that night because of pain in his elbows. Early the next morning, he called Louisiana-Pacific and told the night security guard that he was not coming to work because of his sore elbows. However, he changed his mind and decided to go to work.

At work, Ingbretson told his supervisor that his elbows were sore and that he had no sleep the night before. He was instructed to work at the guard shack. After about two hours, Ingbretson went to his truck, about twelve feet from the gate. He took four more Tylenol and drank a cup of coffee. He sat in the passenger seat of his truck, tilted the seat back, and fell asleep. Ingbretson's supervisor discovered him sleeping in his truck and fired him.

The Workers' Compensation Court found that

4

> [Ingbretson's] falling asleep at work was indirectly, if not directly, attributable to the policies of his employer. On the day prior, [he] was forced to continue working on the stacker despite his pain and his request that he be relieved. As a result, he had a sleepless night. The next morning he initially called in sick but thought better of it. [Louisiana-Pacific] had on prior occasions pressed him to come to work despite pain and doctor's appointments so it could avoid reporting lost employee time due to an accident. The job he reported to on the morning of his termination was a boring and insignificant one, indeed a position that was filled only when [Ingbretson] was unable to work on the stacker.

The court found that Ingbretson's discharge was a pretext by which Louisiana-Pacific rid itself of a disabled employee. It determined that Ingbretson was eligible for temporary total disability benefits and awarded him costs and attorney fees, plus a 20 percent penalty for unreasonable refusal to pay his claim

## Issue 1

Did the Workers' Compensation Court abuse its discretion by deciding an issue not raised in the pretrial order?

The issue to which Louisiana-Pacific here refers was the merits of Ingbretson's discharge, "resulting in a conclusion that he was wrongfully terminated." Louisiana-Pacific argues it was entitled to notice that the court was going to determine this issue.

The pretrial order should be liberally construed to permit any issues at trial that are "embraced within its language." Nentwig v. United Industry, Inc. (1992), 256 Mont. 134, 139, 845 P.2d 99, 102. In the pretrial order, Louisiana-Pacific's first contention was its defense that Ingbretson was discharged for cause. It is disingenuous for Louisiana-Pacific to now claim surprise that the

5

merits of Ingbretson's discharge were considered by the court. Because this issue was raised in the pretrial order, we conclude the court did not abuse its discretion by considering it.

## Issue 2

Did the court exceed its jurisdiction by deciding that Ingbretson was wrongfully discharged from his employment and did it then err in not applying the provisions of Montana's Wrongful Discharge from Employment Act?

The Workers' Compensation Court based its decision on § 39-71-701(4), MCA. That statute allows an employer to avoid paying temporary total disability benefits to an injured employee who has not reached maximum healing by providing a modified or alternative position for the employee. The statute provides:

> If the treating physician releases a worker to return to the same, a modified, or an alternative position that the individual is able and qualified to perform with the same employer at an equivalent or higher wage than the individual received **at** the **time** of injury, the worker is no longer eligible for temporary total disability benefits even though the worker has not reached maximum healing. A worker requalifies for temporary total disability benefits if the modified or alternative position is no longer available for any reason to the worker and the worker continues to be temporarily totally disabled, as defined in 39-71-116.

(Emphasis added.)

Louisiana-Pacific argues that the decision of the Workers' Compensation Court amounts to a determination of wrongful discharge, which was outside the jurisdiction of the court. It also contends that even if the Workers' Compensation Court had jurisdiction to make such a determination, it erred by failing to apply the

6

standards and procedures set forth in the Wrongful Discharge from Employment Act, §§ 39-2-901 through -915, MCA.

In interpreting and applying § 39-71-701(4), MCA, the Workers' Compensation Court concluded:

> On its face, subsection (4) requires payment of temporary total disability benefits to a worker released to perform a modified or alternative job when the alternative or modified position is "no longer available" to him. The Court need not consider whether the "no longer available" language applies in cases where the worker refuses to work in a modified or alternative position, or he is terminated by the employer for deliberate misconduct which he knows, or should know, will result in his termination. This is not such a case. Rather, it is a case where the employer has fired a worker, and thereby made the position unavailable, because of circumstances created by the worker's occupational disease. Moreover, in this case the employer's termination of claimant's employment was pretextual. Under these circumstances, the alternative positions previously available to claimant have become unavailable.

Here, it was not necessary for the court to use the Wrongful Discharge from Employment Act to make its determination. In reaching its decision, the court relied upon its interpretation of the words "no longer available for any reason" in § 39-71-701(4), MCA. The similarity of considerations necessary in applying that statute to those which would be involved in a determination of whether Ingbretson was wrongfully discharged does not mean that the two determinations are the same.

We note that the Workers' Compensation Court did not make a sweeping interpretation of the phrase "no longer available for any reason." It interpreted the phrase only as applied to the facts of this case. We conclude that the court did not exceed its jurisdic-

tion in reaching its decision, nor was it required to apply the provisions of the Wrongful Discharge from Employment Act.

## Issue 3

Did the court err in finding that Ingbretson was temporarily totally disabled within the meaning of §§ 39-71-116(28) and -701, MCA?

Louisiana-Pacific contends that the overwhelming weight of the evidence was that Ingbretson was not temporarily totally disabled. This contention is based upon the doctor's releases to perform a modified stacker operator job or a security officer job. Louisiana-pacific argues that had Ingbretson not left his assigned position and fallen asleep, he would still be employed in those positions.

A two-pronged test is used to prove temporary total disability under § 39-71-116(28), MCA: that the occupational disease results in a total loss of wages, and that the claimant has not reached maximum medical healing. Kramer v. EBI Companies (1994), 265 Mont. 525, 531, 878 P.2d 266, 269. In the present case, it was undisputed that Ingbretson could not return to his "bid job." Louisiana-Pacific has also conceded that Ingbretson had not reached maximum medical healing at the time he was discharged, thus meeting the second prong of the test.

Louisiana-Pacific points out that Ingbretson was released to perform and did perform the positions of a modified stacker operator and guard shack security officer until he was discharged. The issue then became whether this situation was subject to the

8

exception set forth at § 39-71-701(4), MCA, excusing payment of temporary total disability benefits. Did the modified alternative jobs become "no longer available for any reason," pursuant to the statute?

Louisiana-Pacific particularly criticizes as unsupported by the evidence the finding that the guard shack job was "a boring and insignificant one." While not dispositive of the case, this finding is supported in the evidence. Louisiana-Pacific management staff testified that the job was not staffed on day shifts when Ingbretson was not filling it. Ingbretson testified that he did "nothing" when he was stationed in the guard shack.

The record establishes that, on the day before he fell asleep at work, Ingbretson asked to be taken off the stacker position, but the foreman did not do so. The record further establishes that Ingbretson's previous efforts to take time off work due to his disability had been thwarted. Louisiana-Pacific worked Ingbretson beyond his medical restrictions and caused the episode which triggered this lawsuit.

We conclude that the Workers' Compensation Court did not err in determining that Ingbretson's job was "no longer available" under § 39-71-701(4), MCA, and that it did not therefore err in ruling that he was entitled to temporary total disability benefits.

Issue 4

Did the court err in awarding costs and attorney fees to Ingbretson pursuant to § 39-71-611 and § 39-72-402(1), MCA?

9

Our standard of review is whether substantial credible evidence supports the court's finding that the employer's denial of benefits was unreasonable. Stordalen v. Ricci's Food Farm (1993), 261 Mont. 256, 258, 862 P.2d 393, 394. Louisiana-Pacific's argument on this issue is dependent on its argument that Ingbretson was not entitled to temporary total disability benefits. In light of our reasoning above in ruling that the court did not err in finding that Ingbretson was entitled to benefits, we hold that substantial credible evidence supports the court's conclusion that the denial of those benefits was unreasonable and Ingbretson was also entitled to costs and attorney fees.

Issue 5

Did the court err in assessing a 20 percent penalty against Louisiana-Pacific pursuant to § 39-71-2907, MCA?

There is no penalty provision in the Occupational Disease Act. In Wunderlich v. Lumbermens Mut. Cas. Co. (Mont. 1995), 892 P.2d 563, 52 St.Rep. 251, we concluded that the Workers' Compensation Court did not have jurisdiction to assess a § 39-71-2907, MCA, penalty in a dispute arising under the Occupational Disease Act.

Unlike Wunderlich, this is not an appeal from a final determination by the Department of Labor. It is a benefits dispute in which it has already been established that Ingbretson suffered from an occupational disease.

A key element in the Wunderlich opinion is the following:

> In contrast, the Workers' Compensation Court's jurisdiction under the Occupational Disease Act is much more limited. There, the court reviews on appeal final determinations by the Department regarding occupational

10

> disease claims. Section 39-72-612, MCA. The review is
> statutorily circumscribed[.]

Wunderlich, 892 P.2d at 568. Here, the Workers' Compensation Court
has direct jurisdiction which is not circumscribed by § 39-72-612,
MCA, as was the case in Wunderlich.

The Occupational Disease Act provides that "practice and
procedure prescribed in the Workers' Compensation Act applies to
all proceedings under this chapter." Section 39-72-402(1), MCA.
The penalty statute, § 39-71-2907, MCA, was not a part of the
original Workers' Compensation Act, and therefore its application
is not limited to cases under the Workers' Compensation Act. In
this instance, we agree with the Workers' Compensation Court that
the "practice and procedure" of penalty imposition applies through
§ 39-72-402(1), MCA

We affirm the decision of the Workers' Compensation Court in
its entirety.

_____
Chief Justice

We concur:

_____
_____
_____
_____
_____
Justices